We will take up United States v. Giwa Thank you, Your Honor. May it please the Honorable Court, Richard Schoenfeld appearing on behalf of Appellant Giwa. With the Court's permission today, I'd like to focus on two main issues. The first issue is the four-point leadership enhancement that was applied by the sentencing court under 3B1.1, and the second issue is the denial of the motion to suppress. Addressing the first issue, the plea agreement in this case did not contemplate a four-point leadership enhancement under 3B1.1. The government did not request the enhancement under 3B1.1 in the plea agreement, nor did the defendant admit that he was a leader, organizer, or a manager of five or more people in the plea agreement. In fact, at the sentencing in this proceeding, Mr. Eric Johnson, the Assistant United States Attorney, termed the guideline calculation in the plea agreement as a stipulation. He stated the stipulated guideline range, and then he went on. It did not include the four-point enhancement. Nevertheless, the Court adopted in this case the probation's recommendation that Mr. Giwa was a leader, and therefore applied the four-point enhancement. You waived that? Waived the right to appeal the sentence if it was within the guideline range? I appreciate the position that the government has asserted that he did in fact waive that. However, for three reasons, I don't think that that waiver is valid. The first reason, as stated in the opening brief in this case, is that the government in fact breached the plea agreement. And the government, in making their supposed low-end recommendation, stated to the Court, Your Honor, we do recommend a low-end in this case. However, the Court's not bound by that recommendation, nor is the Court bound by our recommendation of a concurrent sentence between the supervisor release revocation and this sentence. So essentially, it was a backhanded recommendation. We're recommending it, but you don't have to follow it. In addition to that, the Court ---- It's a statement of the truth, though, isn't it? It was not a binding plea agreement. However, it was a disingenuous recommendation. And what the Court did as a result of that is, sua sponte. You didn't have to even say that. The Court knows that it doesn't ---- it's not bound by it. I ---- the Court did acknowledge that it was not bound by the plea agreement, and I appreciate that, Your Honor. However, I think that the plea agreement specifically stated, in exchange for the low-end recommendation and the other agreements contained in the plea agreement, Mr. Giewa would waive his right to appeal the guideline calculation as determined by the Court unless there was a departure from that guideline. And I ---- I don't know. It seems to me it was wholly gratuitous for the government attorney to even be saying that. I mean, there was no reason one way or the other to make that statement. Although I think it did have an impact on the Court, because what the Court later did was sua sponte, told the government that they were no longer obligated to make the low-end recommendation under the plea agreement. So the Court essentially voided the plea agreement when it said, I find that the government is no longer bound to make that low-end recommendation, and I am not going to follow that low-end recommendation. So the Court sua sponte voided that part of the plea agreement, and that was the essential consideration as far as contracts go, that Mr. Giewa exchanged his appeal right on the guideline calculation in exchange for the low-end recommendation that the Court then told the government they were no longer obligated to abide by. So if the Court voided that portion of the plea agreement as it relates to the government's obligation, then Mr. Giewa's obligation should also be voided. And then finally the Court would have been able to make a motion, would it not, to void the plea agreement. What Mr. Giewa did, not through counsel but through himself, there's a lengthy colloquy between Mr. Giewa and the Court where Mr. Giewa essentially objects to the proceedings and the nature of what was occurring. And Mr. Giewa in that colloquy or his statement to the Court stated that he had a plea agreement presented to him previously that included the four-point enhancement and he refused to sign it. He was then given a plea agreement that did not include the four-point enhancement and he stated to the Court that that was the basis for him signing the plea agreement. He went on, as a result of his speaking, the government then came back and said, number one, we want to strip Mr. Giewa of his three-point acceptance of responsibility, and number two, the government came back and started arguing in support of the four-point leadership enhancement that was not contained in the plea agreement and was not part of the, quote, stipulated, end quote, guideline calculation. I don't think Mr. Giewa could have made any more of a record without receiving any more of a detriment. His counsel, I agree, probably should have made a motion at that point, but didn't, however, Mr. Giewa, I believe, essentially acting in pro per as it relates to that issue, made as much of a record as he possibly could have to his detriment. As a result, he almost lost his three points of acceptance and he did buy himself a high-end sentence in relation to the guideline range. So I don't think he could have made more of a record, but I do think he made enough of a record to preserve that issue, Your Honor. Finally, as it relates to the waiver issue, the plea agreement stated that I think equity should apply here. For example, if the four-point enhancement is clearly erroneous, I don't think that it's something Mr. Giewa could have waived. It was not contemplated in the plea agreement. There was a stipulated guideline range and the Court made absolutely, I won't say absolutely, but the Court, in light of the decision in U.S. v. Harper and U.S. v. Baraja Montiel, Harper's at 33 F-3rd 1143 and Baraja's at 185 F-3rd 947, the Court didn't make adequate findings. What the Court did was adopted the PSI report's conclusory assertions that the leadership enhancement was applicable in this case. What the Court is required to do under 3B1.1 is identify the five participants, number one, and number two, identify the factors under 3B1.1 that demonstrate by a preponderance of the evidence that Mr. Giewa was, in fact, a leader. For example, that he exercised decision-making authority, his nature and participation in the offense, whether or not he recruited accomplices, whether he claimed a larger share of the fruits, the degree of participation in the planning, and the nature and scope of the illegal activity. And finally, the degree of control and authority exercised over others. And all the Court did in this case was say, well, based on the factual assertions in the plea agreement where it said, quote, he caused, end quote, a person to open a mailbox and he caused a person to open a second mailbox, that that demonstrated that he had control over this and he was a leader and organizer. Were there five different people in the plea agreement? Or how many people in the plea agreement was he causing to do various things related to the mailbox? I believe in the plea agreement there were two people that he, in the factual assertion, caused or directed to do something. But also in that statement of facts there's someone providing Mr. Giewa with things, you know, credit reports, things like that. So essentially you could say the same thing of that person. That person caused 900 credit reports to be given to Mr. Giewa, who then used them to do X, Y, and Z. So I think the term cause is ambiguous and doesn't provide the preponderance of the evidence standard to apply the four-point leadership enhancement. It could have gone both ways. If you look at the statement of facts, there are people causing Mr. Giewa to do certain things as well. It's just not couched in terms of caused or directed. Well, the plea agreement did provide, though, that the Court was authorized to consider any and all relevant conduct. It did. Sure. And wouldn't that include the enhancement of Mr. Giewa's role in this conspiracy? If found by a preponderance of the evidence, and the position I'm taking is under Harper and Barajas-Montiel, there's no record of the preponderance of the evidence of, number one, the five people that were part of the scheme, and, number two, how Mr. Giewa was a leader, organizer, or manager. There are seven factors under 3B1.1 that the Court is to consider, and the Court just made a conclusory adoption of the recommendation in the PSI report without making the preponderance of the evidence finding as to how, in fact, Mr. Giewa was the leader of these people. And I don't think that the record supports the four-point enhancement based on what we have before us. The second issue I'd like to address is the denial of the motion to suppress. And in this issue, what happened was on October 8th and October 9th, postal agents went to Mr. Giewa's apartment. They didn't discover that he lived there until October of 2005. They then took their arrest warrant that they had had for several months and went to his residence. They, I won't say forced entry, but they didn't knock and announce. They received entry by a landlord, went in immediately unannounced. Mr. Giewa was not there on the 8th. They came back on October 9th, again went in without announcing their presence, and Mr. Giewa was, in fact, there. They arrested him at that point, and they saw what they claimed in plain view to be some credit reports. As a result of that information, they went and bolstered a previous affidavit they had prepared in support of a search warrant for Mr. Giewa's residence and his vehicle. And what they did is they added paragraph 17. Prior to that, they had taken that affidavit in support of the search warrant to Assistant United States Attorney Byung-Soo Kim. And Mr. Kim said, you know what, why don't you go there and see if you can get consent to search the residence. And he did not seek a search warrant based upon that affidavit. Now, what's interesting here is the agents claimed that there was some sort of an exigency that required them to immediately enter the residence rather than knocking and seeing if they would be granted admission because Mr. Giewa had previously attempted to flee during execution of a warrant. So you take that position that there was some form of an exigency, and then you take the other position, which is, well, we were going to see if he would cooperate with us and give us consent to search, and they're in consistent positions. And I think what we can gather from that is that there was insufficient evidence or support in the affidavit for the search warrant, and they needed to either get consent to search or bolster that search warrant affidavit. So as a result of the entry with this warrant, they found enough information that they then bolstered their search warrant affidavit. And if we take a look, the basis here is that the arrest warrant that they entered the residence with was invalid for two reasons. One is that it wasn't signed by a judge, which is required under Rule 4, because this was, in fact, a warrant based on an allegation that there was a violation of supervised release or there was probable cause to believe that an offense had been committed being violation of the supervised release. And number two, it wasn't sworn out. And if we look at the Vargas Amaya case, what it says there is that the plain language of the Fourth Amendment, when it defines warrant, requires an under oath swearing of probable cause. That didn't happen in this case. This warrant was not sworn as a result of probable cause, nor was it signed by a judge. So if we proceed from that point that the arrest warrant was deficient, they then went into the residence, and as a result of that deficient arrest warrant, obtained this information that they allege was discovered in plain view to bolster their search warrant affidavit, and they then get the search warrant affidavit, search warrant. They search the residence and the car, and they obtain incriminating evidence. If you excise paragraph 17, which is everything that was obtained on October 9th, there is insufficient probable cause. It's a de novo review. I would ask that the Court take a look at the affidavit. And what's missing is a link between the conduct alleged against Mr. Guiwa and this residence. What they say is that for a period of approximately a year, Mr. Guiwa used credit cards and false identification to purchase watches and various things at different locations. But what's interesting is that the government and the agent weren't even aware of where Mr. Guiwa lived. What they say is that after all of this information, a year of finding out that Mr. Guiwa has been committing this alleged fraud and use of false identification, we then discovered that he lived at this location. What it doesn't state is, has he lived there the entire time? What indication is there that there's going to be evidence of these year-long recitations of offenses at this location that you just discovered? For example, if he had just moved in there the next day and a year previous to that he had committed these offenses, what is there to suggest that there's going to be evidence at this location of the crimes? That's what's missing if you excise Paragraph 17. And with the Court's permission, I'd like to reserve the remainder of time. I want one question on that. What role did this Ms. Menditti play in this? She was a – I'm not sure if that was the housekeeper or if that was the girlfriend. There was a housekeeper who had come in on October 8th, and the box was there and then cleaned up. And the position that was taken at the district court was that on October 9th, the box actually wasn't there. And therefore, it was this entry on October 8th, without probable cause to believe that Mr. Guiwa was even there because his cell phone was in Las Vegas, they entered. So the position taken at district court was the box wasn't there on the 9th, and the statements in the affidavit in support of the search warrant were therefore false or disingenuous. I understand that a credibility determination made by the district court is subject to great deference. So I still obviously support the position raised. However, I think that there's two positions that make that issue moot. One is that if the warrant entirely was invalid because it wasn't signed by a judge, we don't even have to get to that point. And number two – But that case wasn't in effect at the time that this search took place, and it was a case of first impression. So how can we apply it retroactively? Because this case was still pending. It wasn't even on appeal. This case was still pending, number one, so it can still be raised. And then number two, it wasn't a new rule of law. What it was was the case actually said that the Constitution and the Fourth Amendment, the plain language is that the warrant has to be sworn under oath. So to suggest that an officer shouldn't know that when the court specifically said plain language, I don't think we have to apply this retroactively. This was the law. This was the Constitution at the time of the search in this case. And counsel never asked that the suppression hearing be reopened, did he? In reference to which point, Your Honor? Well, regarding this potential testimony of that naditi. He had asked for a continuance, and the judge denied it. He asked for a continuance to have the girlfriend be compelled to testify because she was present when the warrant was executed on October 9th, the arrest warrant, and the judge denied that request, and that's raised in the brief, and I'll submit on the remaining issues in the brief. Okay. Thank you. Good morning, Your Honors. May I please the Court? I'm Camille Dam, representing the United States in this matter, assisting U.S. Attorney from the District of Nevada. It's on the three issues, quite simply, the leader organizer take the position that the issue has been waived, and it was waived by a waiver of appeal in the plea agreement. Even if the defendant were to get past that waiver, the adjustment was properly applied in this case. With respect to the breach of the plea. The defendant makes a really good point on the merits of the leadership thing. I reread the facts, and obviously since they have to be proven by a preponderance of the evidence and the district court relied solely on his admission of the facts, they don't seem to rise to the level of leadership position. It does allege that he caused certain people to do things, but he also states that he was provided with a substantial number of documents and materials by other people, which would probably lead me to believe that he was somewhere in the middle, not necessarily at the leadership level. Well, the facts in the plea agreement, first of all, are replete with instances of saying defendant caused someone to do this, defendant persuaded. Where does it say persuaded? Persuaded may not be the right word. It doesn't say he directed. In the facts it says he caused defendant Yepes to rent a box, he caused defendant Massa to purchase a watch, he caused Yepes to rent another box, he caused Shin with account number to unlawfully obtain a credit history, he directed Tanisha Thomas to rent a mailbox and provided Shin with personal information, he caused Yepes to make false statements, he caused Yepes to fraudulently fill out postal forms on 1, 2, 3, 4, 5 listed occasions. Throughout the statement of facts in the plea agreement are instances where the defendant admitted that he caused these things to happen. And caused means caused. He directed and he was the one that caused it to happen. Beyond that, there were other... So you could say he facilitated? Is that leadership? Facilitating something to happen and causing another person to do something, there's a semantic difference there. It says directed her to do something. There's one allegation of direct. The directed is on page... It looks like 6-6. The bait stamp is so smeared, I have to... 6-6-4 of the excerpt of record. It's page 14 of the plea agreement. The final paragraph on that page, second sentence, he directed her to rent a mailbox speaking of Tanisha Thomas. But throughout the plea agreement, the facts, if you read them in context, it's clear that the defendant was causing, was directing this. And it wasn't just the plea agreement facts that the district court had before it to make the decision. What troubles me is the first paragraph you have, and I assume the government wrote this, right? Did the government draft this?  Generally, that would be the case. Yes, it's on the government's letterhead. Okay, so the first paragraph, it states that Anise Allen provided 300 American Express to GEWA, and also that Paul Shin accessed at least 900 credit reports and provided them to GEWA. So you have him being provided with materials, and then he provides others. That's correct. Okay, so how does that make him the leader? If you read the entire factual outline. Which I have done. All right, thank you. And I assume that Your Honor has, and I'm sorry, I did not mean to imply that Your Honor hadn't. But taken in context, the repleted references to the defendant directing and causing. It seems kind of a sneaky way to go about it, to then rely on that exclusively as the basis for the four-level. I mean, it seems as though the government in this document wasn't even going to argue for the four-level acceptance. And if it was planning, if that was in fact the case, it could have made his role more clear. Do you agree with that, that it could have said that he was the organizer of this group? It could have said that, certainly. But you weren't even planning on arguing for that. No, and the government did not argue for that. The court made it clear at the outset of the sentencing hearing that it had considered the issue as had been briefed to it, and had considered the pre-sentence report in response to the probation officer, and had considered and taken into account all that the court knew about this case already, having been familiar with the co-defendants, having heard from other co-defendants, and the pre-sentence report further supported the finding of the leader organizer. Did the defendant object to what was stated in the pre-sentence report? The defendant objected by saying he personally objected and said he would not have the plea agreement had he known he was going to get the floor level. I'm not talking about the plea agreement. I mean, the PSR can be used. Oh, yes, there was an objection. Is that what the court said? It can be used to meet the preponderance standard if the defendant doesn't object to the facts in it, but if the defendant objects, it can't be used. The government has to put forth evidence. So I'm just wondering whether the facts that the district court relied upon that were in the PSR, whether those were objected to. Yes, they were objected to. And the court did not rely on unsupported pre-sentence report alone. The court relied ñ You can't rely on what is in there at all to meet ñ you can't use it to meet your burden at all if the defendant objects to those facts. I don't think ñ you can't use it to ñ it doesn't meet your burden, but it can be considered as part of the mix. It doesn't meet the burden standing alone, but the district court doesn't have to ignore it. If I were to ñ you know, if we were to decide that this isn't sufficient, we couldn't rely on the PSR alone either, as you just said, right? That's right. I think it's a combination of things that the court relied on. The court relied on the facts in the plea agreement. The court relied on the pre-sentence report. The court relied on its own memory and information, knowledge in the case from having heard from the other defendants. It relied on the facts, and the prosecutor did proffer facts to the court about the fact that this defendant was actually the glue that held the whole thing together. There were only two of the other co-defendants that even actually knew each other. And the court found by clear and convincing evidence that the burden was met to show that it was ñ that the leader organizer applied. There were eight individuals that were named in the indictment, and eight individuals that were named in the plea agreement by name. So clearly there was the involvement of the multiple participants, and the defendant's exercise of control and leadership was shown by the combination of things. The court found it was clear and convincing, and we submit that it was sufficient evidence. But we don't ñ but the issue was weighed in the plea agreement in the first place, and I think the court's aware of our argument on that. Could we move to the warrant, if you made your points? Certainly, Your Honor. The warrant on its face is invalid, isn't it? I mean, it's ñ or maybe not on its face. It wasn't sworn ñ the facts weren't sworn to. That's correct. The facts were not sworn to. And at the time that the petition was submitted for the arrest warrant, that was the current procedure and law. Well, would you concede that if Vargas Amaya applies, it invalidates this warrant? Your Honor, it would be an extension of Vargas Amaya to invalidate the warrant based on that in this case, because in Vargas Amaya, it was the case ñ the court was considering a narrow issue of jurisdiction, and whether the court had jurisdiction to revoke this defendant's supervised release after the term had expired. And in that case, the term of supervised release expired before Vargas Amaya was arrested. But certainly the rationale ñ in order to extend the court's jurisdiction, you need a warrant. Correct. What's a warrant? A warrant is something consistent with a Fourth Amendment requirement that the facts to a warrant be sworn. And I don't know how we can avoid that. In Vargas Amaya, it was applied to the parties before the court, and the decision was reversed because this wasn't a valid warrant. This case is not final yet. There's no way we can avoid applying Vargas Amaya. If you can distinguish it, as you've just tried to do ñ There are two points on that. Okay. But I don't see any grounds for avoiding the effect of it. First of all, the Ninth Circuit itself, this court hasn't extended Vargas Amaya to the ñ to the situation here where the defendant was arrested while he was still on supervised release. And in the Jeremiah case, it makes that point. Well, Jeremiah doesn't make any point about the validity of the warrant. It says it doesn't matter whether an arrest warrant is invalid as long as we're still within the original term of the sentence for the purpose of jurisdiction of the court. But that's using the rule that we don't care how the defendant got here. The defense there was, look, I was ñ I was improperly arrested because it's a bad warrant. And the answer of the court is, we don't care. This isn't a motion to suppress. Nothing ñ there was no search-involved incident to the arrest. You're saying the court has no jurisdiction over the person because the person was improperly hauled into court and that's been a bad plea for 1,000 years. Right. The general rule is a bad arrest warrant doesn't invalidate a subsequent conviction. Right. So we don't know in Jeremiah, the court isn't saying it's okay to arrest on a bad warrant. They're saying it may not be okay to arrest on a bad warrant. We don't have to decide that because it doesn't matter for our decision. Because the defendant was arrested within the term of his supervised release, as was the case here. May be on an invalid arrest. Further, even if Vargas-Amaya applies were squarely within the exception, the Leon good faith exception in this case, there was no unlawful activity to be deterred. The police and the law enforcement agents were acting on the law at the time. They were acting in good faith on what they considered to be a valid arrest warrant and search warrant when they searched. And there was an objectively reasonable reliance on that search warrant and definitely comes within the good faith exception, which should end the matter there. And beyond that, as the magistrate judge and district court found, the search warrant had probable cause even without paragraph 17, which was the only addition that was added to the search warrant from the entry into the apartment. Ms. Dam, could I ask you about the entry into Mr. Gia's apartment? Were there other agents? How many agents went in there? Do you recall? I don't recall offhand. There were marshals, U.S. marshals, and there was at least one postal inspector and perhaps more. I've got to assume more because of the history and information they had about this defendant as having been a flight risk and a danger, so there had to have been more. There were others there. Yes. At the suppression hearing, did any of them testify other than Inspector Leonard? No. He was the only one. She, yes, Your Honor. She. She. Yes, Your Honor. And I see that my time is up, or close to up, and I would just like to reaffirm that the lee on good faith exception should apply here and does. We're squarely within it. Even if Vargas Amaya is applied by this court, that there is probable cause even without that paragraph, so on the search warrant we should have no problem. And the adjustment for leader-organizer was waived in the plea agreement. There was not a breach of the plea agreement by the government, and with that I would submit it and ask that this court affirm both the conviction and the sentence. All right. Thank you, counsel. I'll give you a minute or so more because we kind of took up the time you were going to reserve by asking questions at the end. What I'd like to address is the lee on exception. I don't think that the government can genuinely argue that this was something that the officers acted in good faith because Inspector Leonard had sought a search warrant. AUSA Kim told her, essentially, you don't have enough. They now claim, well, it really wasn't that we didn't have enough. We were going to try to get consent from Mr. Gila. Well, how can you say in good faith that you're going to try to get consent from him, but at the same time say we need to force entry on two occasions because of his history? If you think he's going to have caused some trouble for you or flee or something to that effect as a result of his history, how can you also say you expect him to consent? Really, you can conclude from this that the arrest warrant execution was a subterfuge to gain additional evidence so that they did have probable cause to get a search warrant because without it, the Assistant United States Attorney would not have agreed to submit to the court the affidavit in support of the search warrant. So they can't meet the lee on exception in this instance. Was it within its term of supervised release? I believe it was. Okay. I believe it was. Thank you. Thank you very much, counsel. United States v. Gila is submitted, and we will adjourn this session in the court for today. Thank you.
judges: Canby, Wardlaw, Mills